### RADICH *v.* HUTCHINS.

1. *Carlisle* v. *United States*, 16 Wall. 147, cited and approved.
2. A foreigner, domiciled during the year 1864 in Texas, who, in order to obtain permission of the rebel government to export his cotton, sold at a nominal price, and delivered to its agents or officers for its use, an equal amount of other cotton, which he subsequently redeemed by paying a stipulated sum therefor, directly contributed to the support of the enemy, and gave him aid and comfort. Out of such a transaction, no demand against such agents or officers can arise which will be enforced in the courts of the United States.
3. The coercion or duress which will render a payment involuntary must consist of some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment, over the person or property of another, from which the latter has no other means of immediate relief than by making payment.

ERROR to the Circuit Court of the United States for the Eastern District of Texas.

This was an action brought by Radich against Hutchins and Wells. He alleges in his petition that he is a subject of the Emperor of Russia, and that he was, in 1864, the owner of four hundred and fifty bales of cotton, of the value of $50,000, which he designed to export from Texas, where he then resided, to Mexico, and which were then in transit on their way to Matamoras; that the defendant Hutchins, claiming to be a lieutenant-colonel in the army of the Confederate States, and chief of the cotton office at Houston in that State, combining with the defendant Wells and others, had, without warrant of law, by a public notice, prohibited the exportation of cotton from the State, except upon written permits from his office; that such permits would not be issued, except upon condition that the person desiring to export cotton should sell to them an equal amount, at a nominal and arbitrary price, for the benefit of the Confederate States; that, being desirous to export and sell his cotton, because of the risk incurred of its destruction or loss during the war, and knowing that if he should attempt to send it beyond

the frontier of the State into Mexico the armed forces of the Confederate States, provided to carry out the illegal exactions of the defendants and their confederates, would capture and confiscate it, he was compelled to submit, and did submit, to the condition imposed, and accordingly delivered to the defendants one-half of his cotton, namely, two hundred and twenty-five bales, at a nominal and arbitrary price, as a consideration for a permit to export the other half, but upon a stipulation, however, insisted upon by himself, that he should have the privilege of re deeming the bales sold, and exporting them upon the payment of such sum as the defendants might demand; and that afterwards he paid them $13,357 in specie, and in goods, wares, and merchandise at specie values, in redemption of the bales and for a permit to export them. He alleges that the amount thus paid was illegally and oppressively exacted, and that he submitted to the wrong because of the armed forces to support and enforce it.

The defendants demurred. The demurrer was sustained and the petition dismissed. Radich thereupon sued out this writ of error.

The case was argued for the plaintiff in error by *Mr. Thomas J. Durant*, who cited *Cutner* v. *United States*, 17 Wall. 517; *The Santissima Trinidad*, 7 Wheat. 283; *United States* v. *Guillem*, 11 How. 47; *Sprott* v. *United States*, 20 Wall. 459; *Hickman* v. *Jones*, 9 id. 197; *The Venice*, 2 id. 258.

*Mr. Philip Phillips, contra.*

MR. JUSTICE FIELD delivered the opinion of the court.

If at the time the transaction took place, which has given rise to the present action, the plaintiff was a subject of the Emperor of Russia, as he alleges, that fact cannot affect the decision of the case, or any question presented for our consideration. He was then a resident of the State of Texas, and engaged in business there. As a foreigner domiciled in the country, he was bound to obey all the laws of the United States not immediately relating to citizenship, and was equally amenable with citizens to the penalties prescribed for their infraction. He owed allegiance to the government of the country so long as he resided within its limits, and can claim

no exemption from the statutes passed to punish treason, or the giving of aid and comfort to the insurgent States. The law on this subject is well settled and universally recognized. *Carlisle* v. *United States*, 16 Wall. 147.

The case presented by the petition is without merit.

The substance of the complaint is that the defendants, as officers of the Confederate government, by a public notice, had prohibited the exportation of cotton from the State of Texas to Mexico, except upon condition that the exporter should sell to them an equal amount for the benefit of the Confederate government; and that the plaintiff, being the owner of cotton which he desired to export, and fearing that if he attempted to export it without such permit it would be seized and confiscated by the armed forces of that government, complied with the condition, and obtained a permit from the officers to export two hundred and twenty-five bales, and sold to them an equal amount for the Confederate government, obtaining at the same time the privilege of redeeming the cotton sold, and receiving a permit to export it, upon payment of such sum as they might demand; that he took advantage of this privilege and redeemed the cotton, paying in money and goods the sum mentioned in the petition.

There is nothing in these allegations showing that the defendants subjected the plaintiff to any coercion or duress, which would justify an action against them, either for the return of the money paid or for the value of the goods delivered in place of the money, or for damages of any kind. There is no averment that either of the defendants ever made, or attempted to make, any seizure of the cotton, or that either of them was an impressing or other officer, exercising or claiming to exercise any power for its seizure, or had any thing to do with the command or operations of the armed forces of the insurgents in the State of Texas. All that is directly charged against them is the publication of a notice that the exportation of cotton was forbidden, except on permits from the cotton office. The armed force is not stated to have been under the direction of that office. The whole proceeding set forth in the petition was a voluntary one by the plaintiff. He applied to the cotton office, and sold the cotton subsequently redeemed. It is not

pretended that either of the defendants made any application
for its purchase.

To constitute the coercion or duress which will be regarded
as sufficient to make a payment involuntary, — treating now the
redemption of the cotton as made in money, goods being taken
as equivalent for a part of the amount, — there must be some
actual or threatened exercise of power possessed, or believed
to be possessed, by the party exacting or receiving the payment
over the person or property of another, from which the latter
has no other means of immediate relief than by making the
payment. As stated by the Court of Appeals of Maryland, the
doctrine established by the authorities is, that " a payment is
not to be regarded as compulsory, unless made to emancipate
the person or property from an actual and existing duress
imposed upon it by the party to whom the money is paid,"
*Mayor and City Council of Baltimore* v. *Lefferman*, 4 Gill
(Md.), 425; *Brumagim* v. *Tillinghast*, 18 Cal. 265; *Mays* v.
*Cincinnati*, 1 Ohio St. 268.

Tested by these cases, the allegation of coercion or duress
becomes frivolous. It is plain that the plaintiff entered volun-
tarily upon the negotiation with the defendants, and subse-
quently paid the redemption money without any constraint
which would in law change the voluntary character of the
payment. Such being the case, the transaction is one which is
fatally tainted. The sale of the cotton was to the Confederate
States; the money paid and goods delivered for its redemption
were for the benefit of those States, to assist them in their war
against the government and authority of the United States.
The money paid and the goods delivered constituted, therefore,
nothing less than a direct contribution to the support of the
insurgents: they gave aid and comfort to the enemy. No
demand arising out of such a transaction can have any stand-
ing in the courts of the Union.

At this time, also, it was the declared policy of the United
States to prevent all intercourse between the insurgent States
and the loyal States, and also between them and foreign
countries, and thus to cut off from the insurgents the means of
prolonging the existing war. In pursuance of this policy, the
ports and coasts of those States were blockaded, commerce

with their inhabitants was prohibited, except as specially authorized under regulations of the Treasury Department, and property which eluded the blockade was subject to seizure and condemnation. The attention of the authorities was specially directed to prevent the exportation of cotton, upon which the insurgents chiefly relied to obtain the means for the continuance of their struggle. The plaintiff alleges that he paid money and delivered goods to the defendants for the use of the Confederate government, in order to obtain permission to violate this policy and legislation, and now he modestly asks that he should be allowed in the courts of the United States to recover damages from them because they took what he offered for the permission.

The demurrer was properly sustained.

*Judgment affirmed.*